IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CECILIA SCHWABER,    * <br> TRUST TWO, *et al.*    * <br>     Plaintiffs,    * <br>      * <br> v.    * <br>    * <br> HARTFORD ACCIDENT AND    * <br> INDEM., CO., *et al.*    * <br>     Defendants.    * <br>     ***** | Civil No. JFM 06–0956 |

**OPINION**

Cecilia Schwaber Trust Two and related entities (referred to collectively as "Plaintiff") have filed this lawsuit against Hartford Accident and Indemnity Company and related entities (referred to collectively as "Defendant"). Plaintiff alleges that Defendant breached its insurance contract with Plaintiff and engaged in bad faith in failure to pay claims under the insurance policy. (Compl. ¶¶ 15, 45.) Plaintiff seeks compensatory damages, attorney's fees, punitive damages, and declaratory relief. (*Id.* ¶¶ 15, 18, 40, 45.) In an earlier opinion, I dismissed plaintiff's bad faith claims under Indiana and Pennsylvania law. *See Cecilia Schwaber Trust Two v. Hartford Accident and Indem., Co.*, 437 F. Supp. 2d 485 (D. Md. 2006). Plaintiff has now moved for summary judgment on it contract claims and seeks to reinstate a bad faith claim in light of a recently-enacted Maryland statute. Defendant has filed a cross-motion for partial summary judgment on a damages issue. For the reasons set forth below, plaintiff's motion for summary judgment is granted in part and denied in part, and plaintiff's motion to reinstate a bad faith claim (treated as one to amend its complaint) is granted. Defendant's cross-motion for

partial summary judgment is denied.[1]

## I. FACTS[2]

Defendant issued an insurance policy to plaintiff with effective dates of March 1, 2002 through March 1, 2003. (Compl. ¶ 3.) The policy covered the property located at 2331-2339 Washington Boulevard in Baltimore, Maryland. (*Id.*) During the period in question, plaintiff leased the property to H.C. Walterhoefer, Inc., a corporation that held an option to buy the property for the price of $1,550,000. (Pl.'s Ex. 29.) In February 2003, a snowstorm in the Baltimore area resulted in a large accumulation of snow and ice on the roof of the property. (Compl. ¶ 12.) In March 2003, the building began to show evidence of damage to the roof; in particular, the roof sprung a series of leaks that resulted in interior "water intrusion and ceiling failure." (*Id.*)

Plaintiff hired several engineers and roofers to examine the cause and degree of the damage. (*Id.* ¶ 13.) Plaintiff then filed a claim with defendant, seeking coverage under the policy. (*Id.*) Defendant initially denied coverage in full, claiming that the damage to the roof was caused by "water leakage over a prolonged period of time." (Pl.'s Ex. 19 at P622.) Later, defendant amended this position and agreed that a small portion of the loss, approximately 5%, was subject to coverage and that the rest of the damage was attributable to the excluded causes of faulty workmanship, maintenance, and wear and tear. (Pl.'s Ex. 19 at P657.)

---

[1] The legal standards governing summary judgment motions are well established. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that may affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The facts must be construed in the light most favorable to, and all justifiable inferences will be drawn in favor of, the non-moving party. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2] Because I have set forth the background facts in my earlier opinion, *see Cecilia Schwaber Trust Two*, 437 F. Supp. 2d 485, I will recite here only the facts relevant to the pending motions.

Meanwhile, in March 2005, plaintiff sold the property to the tenant at a price of $843,900.  (Pl.'s Ex. 30 at P890.)  This sale price was reached by deducting the estimated cost of replacing the damaged roof ($706,100) from the original option contract price of $1,550,000.  (*See* Pl.'s Ex. 22 at P979; Pl.'s Ex. 29.)  In December 2006, the roof replacement was completed at a final actual cost of $723,200.  (Pl.'s Ex. 24.)  In February 2006, plaintiff filed suit against defendant in the Circuit Court for Baltimore City.  (*See* Not. of Removal ¶ 1.)  In April 2006, defendant removed the case to this Court.  (*Id.*)

## II.  The Insurance Policy's Exclusions And The Question Of Causation

Plaintiff first moves for summary judgment on the question of whether either of the two policy exclusions relied upon by defendant - one for faulty workmanship and maintenance and the other for normal wear and tear - is applicable.  In relevant part, the policy provides:

> **A.  GENERAL EXCLUSION**
> We will not pay for loss or damage caused by, resulting from, or arising out of any acts, errors, or omissions by [plaintiff] or others in any of the following activities, regardless of any other cause or event that contributes concurrently, or in any sequence to the loss or damage: . . .
> (3.)  Any of the following performed to or for any part of [property]:
>     (a.) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; or . . .
> (4.)  Maintenance. . . .
> But if direct physical loss or direct physical damage by a Covered Cause of Loss ensues to Covered Property, we will pay only for such ensuing loss or damage. . . .
> **29.  Other Exclusions**
> We will not pay for loss or damage caused by, resulting from, or arising out of:
> (a.) Wear and tear . . .
> But if direct physical loss or direct physical damage by a Covered Cause of Loss ensues to Covered Property, we will pay only for such ensuing loss or damage.

(Pl.'s Ex. 18 at P467, P472.)

Plaintiff contends that neither of these exclusions applies because defendant has presented insufficient evidence to establish multiple causes of the loss plaintiff suffered.

Plaintiff makes the closely related, but analytically distinct, argument that defendant has not proven that faulty workmanship or maintenance or wear and tear were proximate causes of the collapse of the roof.

The second of these arguments raises the question of whether the concept of proximate cause is material in determining the scope of the exclusions relied upon by defendant. Defendant concedes that it is as to the wear and tear exclusion. However, as to the faulty workmanship/maintenance exclusion, defendant contends that "proximate cause" is irrelevant because the exclusion expressly states that it applies "regardless of any other cause or event that contributes concurrently." (Pl.'s Ex. 18 at P467.) Plaintiff argues, to the contrary, that in order for the exclusion to apply faulty workmanship or maintenance must have been the proximate cause of the loss.

Defendant's position is correct. The Maryland Court of Appeals has made clear that a proximate cause analysis is not appropriate when the insurance contract establishes a different standard:

> . . . [T]he terms of the policy determine the reach and extent of its coverage. In this connection, principles of causation will not be applied to defeat the intent of the parties, as manifested in the insurance contract; indeed, as [prior cases have] noted . . . general definitions of proximate causation afford little aid in determining whether a particular loss was intended to be covered under the insurance policy. We think that the parties intended, from the language used in the insurance contract construed as a whole, that any loss which resulted from any [excluded cause] was excluded from coverage, and that the exclusionary cause was all-encompassing in this respect.

*Aragona v. St. Paul Fire and Marine Ins. Co.*, 378 A.2d 1346, 1351 (Md. 1977) (internal citations omitted); *see also N. Assurance Co. of Am. v. EDP Floors, Inc.*, 533 A.2d 682, 688 (Md. 1987) (citing *Aragona* to show that Maryland "caution[s] . . . against the inappropriate use of principles of causation" in the interpretation of insurance contracts).

Here, the contract clearly contemplates that loss "caused by, resulting from, or arising out of" faulty workmanship will be excluded from coverage "*regardless of any other cause or event that contributes concurrently.*" (Pl.'s Ex. 18 at P467 (emphasis supplied).)  Thus, defendant is fully relieved of any payment obligation attributable to such excluded causes.  The breadth of the policy's causal language warrants deference.  As the Maryland Court of Appeals has stated, the "words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or like." *EDP Floors, Inc.*, 533 A.2d at 688; *see also Mass Transit Admin. v. CSX Transp., Inc.*, 708 A.2d 298, 306 (Md. 1998) (approving of insurance treaties that define "arising out of" as "originating from, growing out of, flowing from, or the like").

Accordingly, where an insurance contract "flatly provide[d] that there [was] no coverage for injuries arising out of the operation or use of a motor vehicle," the insurance company was relieved of liability despite the existence of other causes.  *EDP Floors, Inc.*, 533 A.2d at 688.  As in *EDP Floors*, here there is "no ambiguity in the policy exclusion" and "the first principle of construction of insurance policies in Maryland requires that we apply the terms of the contract as written." *Id.* at 689.  Consequently, defendant is not required to prove that the excluded cause was the proximate cause but only that some or all of the loss was caused by, resulted from, or arose out of faulty workmanship or maintenance.  *Cf. Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.*, 2005 WL 2453002, at *5 (D. Md. Sept. 30, 2005) (contending that *EDP Floors* and other Maryland cases stand for the proposition that an exclusion "can apply even when the injury may also be said to have arisen out of other . . . acts").

On the summary judgment record defendant has presented sufficient evidence to meet

this burden.[3] It has come forward with expert testimony showing that the roof was initially constructed with inadequate thickness in its gypsum decking, as well as evidence concerning additional intervening stresses to the roof. (*See, e.g.*, Def.'s Ex. J, Dep. of Lyle Hogan at 121 ("It was – where I saw it, it was the thinnest gypsum deck I've ever encountered. The thinnest one."); *id.* at 134 ("Yes, this is substandard construction."); *id.* at 134 ("I'm going to testify that this is flawed construction because of the thin deck pour, coupled with the very light reinforcement, coupled with unframed openings."); *id.* at 82 ("[I]t was an inherently inadequate deck because it was poured quite thin . . . "); *id.* at 186 ("I agree [that the snow was the final straw], but in order for it to have a – be a final straw, there had to be some earlier straws.").) Indeed, even plaintiff's expert admits that the gypsum decking was below industry standard. (Pl.'s Ex. 32, Report of William Rockey at 1062 (". . . the gypsum thickness is below the industry standard of 2" . . .").)

I recognize that plaintiff has presented contrary evidence, disputing the view that the substandard gypsum decking contributed to the loss and supporting the conclusion that the snowstorm alone caused the damage to the roof. (*See generally id.* at 1061 ("After review of the facts in this case, we do not support Hartford's contention that the roof structure was inherently flawed in design and construction and poorly maintained."); *id.* at 1063 ("Had it not been for the overwhelming effects of the Presidents' Day snowstorm in February 2003, we believe the roof would have been intact and serviceable today."); Pl.'s Ex. 51, Dep. of Gary Brown at 137 ("Q: So it's your testimony to a reasonable degree of engineering certainty that any cracking or

---

[3] Indeed, although I need not examine the issue closely at this stage of the litigation, the summary judgment record also appears to present a genuine issue of material fact concerning whether wear and tear was the *proximate* cause of plaintiff's loss. If that is so, the wear and tear exclusion, as well as the faulty workmanship/maintenance exclusion, remains in play.

fracturing that you found . . . was due solely to the load of the snow? A: To a heavy load greater than say 40 pounds or so.  Q: The snow? A: The snow.").)  However, plaintiff's evidence merely establishes a classic duel between competing experts, and judging the credibility of experts falls squarely within the province of the jury.  Consequently, plaintiff's motion for summary judgment on the issue of the applicability of the policy exclusions is denied.[4]

### III.  The Extent of Potential Damages and the Necessity of Total Roof Replacement

Plaintiff also moves for summary judgment on the issue of damages, seeking to foreclose defendant's argument that the damage to the roof did not necessitate its complete replacement.  Plaintiff relies on evidence showing that complete roof replacement was the only prudent course of action and that the amount of potential damages should thus include the entire amount spent in consideration of replacement – to wit, $706,100.  (*See, e.g.*, Pl.'s Ex. 3, Report of Gale Associates at P1146 ("The roof system and structural roof deck should be scheduled for replacement in the near future.  We anticipate the cost of this renovation to be in the neighborhood of $700,000 to $900,000."); Pl.'s Ex. 32, Report of Century Engineering at P1065 ("It is important to note that replacement of the entire roof and gypsum deck was necessary for the reasons previously stated."); Pl.'s Ex. 51, Dep. of Gary Brown at 196.)

Relying on the report and deposition testimony of its expert, Lyle Hogan, and a repair bid

---

[4] Plaintiff makes an ancillary argument that defendant should be foreclosed from arguing faulty workmanship because the roof was built to code at the time of construction.  This argument is unavailing.  To begin with, the language of the insurance contract is what controls here – not decades-old regulatory standards.  *Cf. Beatty v. Trailmaster Prods., Inc.*, 625 A.2d 1005, 1014 (Md. 1993) (". . . [C]ompliance with a statute does not necessarily preclude a finding of negligence or product defectiveness where a reasonable person would take precautions beyond the statutorily required meaure.").  Moreover, even if contemporaneous building standards are admissible as relevant at trial, such evidence is not dispositive at this stage of the litigation – especially when one of plaintiff's own experts admits that "the thickness of the deck was substandard" and that such inadequate decking was "[t]he most likely reason that the roof . . . did not fare as well through the Blizzard . . . and did not provide an additional factor of safety."  (Pl.'s Ex. 3, Report of Gale Associates at P1145.)

submitted by contractor John Murray, defendant argues that a genuine issue of material fact exists on the question of whether a total roof replacement was necessary.  A close examination of the record discloses that this argument is without merit.  Hogan's report does conclude that: "Widespread or complete reroofing is unwarranted from this storm event."  (Def.'s Ex. I, Report of Lyle Hogan at 000635.)  However, although Hogan's initial deposition testimony seems to support his report, (*See* Def.'s Ex. J, Dep. of Lyle Hogan at 138 ("Q: Is it your opinion that it would have been possible to do spot repairs of this particular roof structure?  A: I'm going to say yes for now . . .").), his later testimony later undermines this conclusion.  In that testimony he opined that he would recommend total roof replacement if "[s]eventeen to nineteen, twenty-one, twenty-two percent – something in that range – of the total surface area" was damaged.  (*Id.* at 146.)  Moreover, Hogan acknowledges that he was not asked to evaluate what percentage of the roof was damaged and that his report should not be interpreted as reaching a conclusion on that question.  (*Id.* at 146–47 ("Q: . . . And you have not been asked to render an opinion as to what percentage of this roof was damaged, you were just asked to render an opinion as to the cause of the damage that you did see?  A: That's mostly correct, ma'am.  You know, what happened here.  That was my task.  Q: Okay.  And you don't have an opinion as to what percentage of this roof was – was compromised?  A: No."); *see also id.* at 148 ("Q: Okay.  And that if [*sic*] somebody used [your report] and tried to interpret that that's [*sic*] your estimate as to the total damage, they would be dead wrong?  A: That's the danger of extrapolating somebody else's data.").)  Thus, Hogan's testimony, which largely focuses on the causation issues discussed in section II of this Opinion, is at best unclear and ambiguous on the question of roof replacement.

      Defendant's reliance on the bid submitted by John Murray, a contractor, is similarly

misplaced. Although Murray did submit a bid of $50,833.00 to accomplish the proposed repairs, it is undisputed that this amount reflected only an estimate of what it would cost to repair the areas specifically requested by defendant. (Def.'s Ex. M at 000682.) The bid did not represent a conclusion that the roof did not need to be replaced or that the proposed repairs would fix the problem altogether. (Pl.'s Ex. 60, Dep. of John Murray at 9–10 ("Q: Did you make any recommendation as to how much of the roof needed to be repaired or did you just do what the insurance company asked you to do, which was do a bid for the areas that were presently covered by plywood sheets on the underside? A: I just give [*sic*] them a bid on what they requested me to bid on.").) Indeed, Murray's bid letter actually seems to favor plaintiff's position on this issue: "I have inspected the above roof and I believe *the entire roof deck* has been fractured. *However*, I have developed a price to replace and repair the areas that are presently covered by plywood sheets on the underside, plus areas with broken form board." (Def.'s Ex. M at 000682 (emphasis supplied).)

In addition, defendant's other engineers appear to be in agreement with plaintiff that total roof replacement was necessary. For example, the report provided to defendant from Meyer Consulting concluded flatly that the "roof decking has to be removed and replace in its entirety." (Pl.'s Ex. 39, Report of Meyer Consulting Engineers at 000780.) Moreover, after defendant's engineer was asked to compare plaintiff's report with his own report, he stated clearly: "It appears that *both reports recommend deck replacement (which would require re-roofing)* and other than a disagreement over the primary cause of the deck failures they appear to be in agreement as to necessary remedial action." (Pl.'s Ex. 40, Bose Letter at 000600 (emphasis supplied).)

In sum, there is no genuine issue of material fact concerning the necessity of total roof replacement. While one of defendant's experts opines that he thought total roof replacement was unnecessary, this conclusory averment is unsupported by both his own testimony and the reports and conclusions of every other person to consider the question. "[M]ere speculation" is insufficient to create a genuine issue of material fact and stave off summary judgment. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, plaintiff's motion for summary judgment on the extent of potential damages is granted.

### IV. Plaintiff's Entitlement to Recover Cost of Total Roof Replacement

Defendant cross-moves for partial summary judgment on the question of whether, assuming that no policy exclusion applies, plaintiff is entitled to recover the cost of the total roof replacement. This argument is based upon the fact that plaintiff did not go out, hire, and pay a roofer to replace the roof; rather, plaintiff simply sold the building to the property's tenant at a discounted price reflecting the necessity of roof replacement. According to defendant, this sale forecloses plaintiff from full recovery, and plaintiff cannot recover anything more than the amount the plaintiff "actually spent on repairs prior to the sale of the property." (Def.'s Cross-Mot. at 2.)

I find defendant's argument to be overly formalistic and unpersuasive. The pertinent provision of the subject policy states:

> We will not pay more than your financial interest in the lost or damaged property. . . . In the event of covered loss or damage, we will determine the value of Covered Property *at the actual amount spent to repair, replace, or rebuild*. . . . We will not pay more for lost or damaged property than the least of . . . the amount you actually spend . . .

(Def.'s Ex. A at 12 (emphasis supplied).) In my view to conclude from this language that plaintiff must have literally opened its wallet and paid a roofer would place an unduly narrow

interpretation on the policy. As an initial matter, the policy's language itself is ambiguous even if one accepts defendant's narrow interpretation of "spent." *Cf. MAMSI Life & Health Ins. Co. v. Callaway*, 825 A.2d 995, 1005–06 (Md. 2003) ("Although Maryland law does not construe insurance policies as a matter of course against the insurer, when a term in an insurance policy is ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.") (internal citations omitted). The intent of the policy provision, as stated in the third sentence, is to assure that defendant "will not pay more than your financial interest in the lost or damaged property." (Def.'s Ex. A at 12.) Fulfillment of this intent does not require that an insured person actually pay a contractor to recover for damages to a property.

Moreover, looking at the facts as a whole, plaintiff certainly spent a large sum in light of the damage to the roof, and that expenditure was undoubtedly in order to replace the roof. *Cf. Glen Falls Ins. Co. v. Sterling*, 148 A.2d 453, 456 (Md. 1959) (stating that courts should look "to the substance of the whole transaction rather than to seek a metaphysical hypothesis upon which to justify a loss that is no loss") (internal citations omitted). Before the snowstorm, plaintiff entered into an option contract with the tenant; under that contract, the tenant could purchase the property for $1,550,000. (*See* Pl.'s Ex. 29.) After the snowstorm, plaintiff and the tenant re-negotiated the sale price in light of the damage to the roof. Properly discounting the original option contract price by the cost of the low bid for roof replacement ($706,100), plaintiff ultimately sold the property to the tenant for $843,900. (*See* Pl.'s Ex. 30.) According to plaintiff's uncontradicted evidence, this transaction was commercially reasonable in light of the property's decreased value. (*See* Pl.'s Ex. 57 at 18.) Thus, while plaintiff did not itself pay the roofer who ultimately replaced the roof, plaintiff did spend the money to replace the roof by

discounting the sale price of the building by the estimated cost of the roof replacement. As an economic matter, the tenant who purchased the property was simply a middleman who received plaintiff's payment and transferred it to the roofer.[5]

### V.  Plaintiff's Motion to Reinstate Bad Faith Claim

Plaintiff also moves to "reinstate" its claim that defendant acted in bad faith and should thus be liable for attorney's fees.[6] (Pl.'s Mem. at 47.) I initially dismissed plaintiff's bad faith claims after finding, pursuant to *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), that Maryland law governs here and provides no cause of action for bad faith failure to settle first party insurance claims. *See Cecilia Schwaber Trust Two*, 437 F. Supp. 2d 485.

However, a new Maryland statute that became effective October 1, 2007 grants a plaintiff the right to recover attorney's fees from his or her insurance company if it can be shown that the company failed to act in good faith in settling the plaintiff's claim. *See* 2007 Md. Laws 150. Plaintiff argues that this new statute was intended to apply retroactively and can thus be asserted here even though the events underlying this lawsuit occurred in 2003.

Defendant concedes that the Maryland General Assembly intended the statute to apply

---

[5] The unpublished case relied on by defendant, *Park Ctr. III Ltd. P'ship v. Pennsylvania Mfrs. Assoc. Ins. Co.*, 2002 WL 255504 (4th Cir. 2002), is wholly inapposite. In *Park Center*, the Fourth Circuit merely held that, under Virginia law, when an insured elects a less costly method of replacement, an insurance company is not thereby bound to pay the amount of the hypothetical more expensive method. *Id.* at *7–9. Here, there is no question that the plaintiff's pecuniary loss was the cost of the estimated roof replacement and that the roof was actually replaced. Indeed, the roof was replaced at a *higher* cost than estimated. (*See* Pl.'s Ex. 24.)

[6] Plaintiff's motion to "reinstate" the bad faith claim is best understood as a motion to amend the complaint to add new a claim. Plaintiff cannot "reinstate" the earlier claims, as they were based on Pennsylvania and Indiana law and remain inapplicable to this case. *See Cecilia Schwaber Trust Two*, 437 F. Supp. 2d 485. Thus, the motion must be evaluated under Federal Rule of Civil Procedure 15. Under that rule, contrary to an argument made by defendant, there is no limitations bar to the bad faith claim. The claim clearly "arose out of the" same transaction as the claims in the initial complaint. Fed. R. Civ. P. 15(c)(2). Moreover, plaintiff's failure to include the bad faith claim in its initial complaint is self-evidently excusable in light of the fact hat the statutory basis for the claim did not exist at the time of initial filing.

retroactively. (*See* Def.'s Opp'n To Mot. To Certify at 1 ("Maryland's legislature apparently intended that Senate Bill 389 apply retroactively.")). However, defendant also raises a variety of state and federal constitutional objections to such retroactive application. These issues present important questions of law and policy. However, at the present time I need not either decide them or (as suggested by plaintiff) certify them to the Maryland Court of Appeals. Instead, I will defer deciding them until and unless it becomes clear that their resolution is necessary to the outcome of this litigation. In the meantime, plaintiff's motion to reinstate its bad faith claim will be treated as a motion to amend the complaint and will be accordingly granted.

A separate order effecting the rulings made in this Opinion is being entered herewith.

Date: December 17, 2007

　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　J. Frederick Motz
　　　　　　　　　　　　　　　　　　United States District Judge